Filed 9/26/14  P. v. Dayton CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| THE PEOPLE, | B248991 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA364774) |
| v. | |
| JESSE LEVI DAYTON, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Craig E. Veals and Lisa B. Lench, Judges.  Affirmed as modified.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jesse Levi Dayton appeals his conviction of one count of shooting at an occupied motor vehicle (Pen. Code, § 246),[1] five counts of attempted willful, deliberate, and premeditated murder (§ 664, 187, subd. (a)), and one count of possession of a firearm by a felon (§ 12021, subd. (a)(1)), with true findings on firearm use and criminal street gang allegations. He claims the court erred in finding he was competent to stand trial, and that trial counsel rendered ineffective assistance by failing to introduce evidence of mental and physical impairment to negate the required mental states, and by failing to request instruction on such evidence. He also points to error in the abstract of judgment. We order the abstract of judgment corrected, and affirm the judgment as modified.

## FACTUAL AND PROCEDURAL SUMMARY

Late in the afternoon on November 16, 2009, Oscar Calvillo Sr. (Oscar Sr.) was driving his red van on Figueroa near 52nd Street in Los Angeles, heading to pick up one of his sons. His oldest son, Oscar Calvillo Jr. (Oscar Jr.), was in the front passenger seat. His son Juan, his nephew, and a friend were in the back. The driver's side window was down. As Oscar Sr. turned onto 52nd Street, he saw two individuals. As he continued forward, one of them crossed the street behind his van and yelled "Temple Street" at him.

Oscar Sr. knew Temple Street was a gang that had moved into the area. He had not had any trouble with that gang, and he decided to talk to these two men to let them know that "I pass by there every day, . . . so that they would know that I used to live there and that my family still lives there and I never had any trouble and I didn't want any." Oscar Sr. put his car in reverse and drove backwards, toward the men. In his rearview mirror, he saw one of the men, who was wearing a dark baseball cap, crouch down near a parked car. The man reached toward the tire, as if to get something. He then put his hand under his shirt, near his waistband. Oscar Sr. lost sight of the men, then heard several gunshots. Oscar Sr. was shot in the neck, Oscar Jr. was shot in the shoulder. Oscar Sr. lost control of his hands and feet, and was unable to drive. Oscar Jr. reached over to steer the car while Juan depressed the accelerator with his hand. The van drove

---

[1]     All statutory references are to the Penal Code.

down the street in this manner and crashed into a fence. Oscar Sr. was moved to the passenger seat and Oscar Jr. drove the van to his aunt's house a few blocks away.

At the time of the shooting, two Los Angeles police officers were driving east on 52nd Street in a marked patrol car. They heard eight or nine gunshots, then saw Oscar Sr.'s red van driving westward, in their direction, and swerving erratically. The driver was slumped over and the front passenger was holding his neck. As the officers passed the van, they smelled fresh gunpowder. Occupants in the van pointed eastward, behind them. The officers saw an individual step out from behind a burgundy four-wheel-drive vehicle. His hand was on a gun which was partially concealed in his waistband. The man looked in the officers' direction, then fled eastward. The officers followed in their patrol car until the man ran into a driveway. The officers followed on foot and found appellant hiding under a camper shell in the driveway. They recovered a nine-millimeter semiautomatic pistol on the ground, about five feet from the camper shell. All of the ammunition had been fired from it. Nine cartridge casings and a spent bullet were recovered from the crime scene. They were all fired from the semiautomatic pistol found near appellant. Appellant was interviewed by two police detectives. That interview was recorded.

Appellant was charged with multiple counts of attempted murder. At the outset of the proceedings in April 2010, the defense declared a doubt as to appellant's mental competency and submitted a psychological evaluation by Robert J. Rome, Ph.D., a licensed psychologist. Dr. Rome reported appellant displayed low cognitive functioning, significantly below average communication, limited verbal expression with stuttering and stammering, and a moderate to severe hearing loss in his right ear. It was Dr. Rome's opinion that appellant "does not appear capable of appropriately assisting his attorney in his own defense."

The court suspended criminal proceedings pursuant to section 1368, and appointed Kaushal K. Sharma, M.D., to examine appellant. Dr. Sharma, a clinical professor of psychiatry at the USC Keck School of Medicine, concluded in his May 2010 report: "Notwithstanding the defendant's claimed 'symptom' of hearing a man's voice when he

3

is angry and his slow responses, he is able to understand his legal predicament and can provide meaningful information to his attorney as he provided to this examiner. Thus, I believe he is competent to stand trial." The court set the matter for a competency hearing.

In May 2011, the court received a report from forensic and general psychiatrist Kory J. Knapke, M.D. Dr. Knapke found appellant had difficulty focusing on the examination, appeared confused and lethargic during the interview, seemed to respond to internal stimuli on two occasions during the interview, had a very poor understanding of courtroom proceedings, and "is unable to rationally cooperate with his attorney or his court proceedings at this time." It was his view that for appellant to receive a fair trial, he should be transferred to a state hospital in order to stabilize him and thoroughly evaluate him. He felt appellant could be restored to competency in a timely manner. Based on this report, the court found appellant was not mentally competent to stand trial and ordered him transferred to Patton State Hospital.

On July 26, 2011, two new competency reports were submitted to the court. One was prepared by Neena Sachinvala, M.D., a forensic psychiatrist and clinical professor at UCLA. She concluded appellant was not competent to stand trial. The second report was from Dr. Sharma, who previously had examined appellant in May 2010. It was his opinion that appellant "is competent to stand trial and is intentionally, willfully and consciously trying to present himself as incompetent."

The competency hearing occurred over several days, beginning in late August 2011. Dr. Sachinvala and Dr. Rome testified for appellant. The court then received a second report from Dr. Knapke, who had conducted a new interview with appellant. It was his opinion that appellant "does understand the charges and proceedings against him, and he has the capacity to rationally cooperate with his attorney if he so chooses." After considering the reports and testimony and making its own observations as to appellant's behavior, the court found appellant competent to stand trial. Criminal proceedings were reinstated.

At trial, appellant's defense was self defense. He testified that he shot at the van when it backed up toward him because he thought the occupants were rival gang

4

members who were going to shoot him.  The jury found appellant guilty on all charges, and found the firearm use and street gang allegations to be true.  This is a timely appeal from the judgment of conviction.

## DISCUSSION

### I

Appellant claims the court violated his right to due process by finding him competent to stand trial.  The due process clause of the Fourteenth Amendment and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent.  (*People v. Mai* (2013) 57 Cal.4th 986, 1032; *Drope v. Missouri* (1975) 420 U.S. 162, 171; § 1367.)  The test is whether the defendant "'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him.'"  (*Dusky v. United States* (1960) 362 U.S. 402.)  "A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence by the party contending he or she is incompetent."  (*People v. Blacksher* (2011) 52 Cal.4th 769, 797.)[2]  In reviewing a finding of competency, the appellate court must view the record in the light most favorable to the verdict and uphold the verdict if it is supported by substantial evidence.  (*Ibid.*)

In this case, the court received conflicting reports of appellant's competence. According to Dr. Sachinvala, appellant admitted to hearing voices, talked to himself throughout the evaluation, laughed and clapped his hands, did not know the present president, and had difficulty responding to questions.  She concluded that appellant "is presently incompetent to stand trial, even though he understands the charges lodged against him.  He does not understand the court proceedings because he appears to be of

---

[2]     This is in contrast to the substantial evidence standard, which is applied by the trial court in determining whether to hold a competency hearing. (See *People v. Mai, supra,* 57 Cal.4th at p. 1032 ["[T]he trial court must suspend criminal proceedings and conduct a competency hearing if presented with substantial evidence that the defendant is incompetent."].)

5

below average intelligence and has impaired attention and concentration. However this could be overcome with educating him on the process."

The second report was from Dr. Sharma, who previously had examined appellant in May 2010. For this new evaluation, Dr. Sharma considered the reports of Dr. Rome and Dr. Knapke, and reviewed the DVD recording of appellant's police interview. In that interview, appellant had no speech difficulties and had no problem with alertness. Appellant also had been responsive when Dr. Sharma interviewed him in 2010. This was in contrast to the conclusion by Dr. Rome that appellant had been "essentially unresponsive" and the observation by Dr. Knapke that it was "as if he was acutely intoxicated and sedated and provided minimal information." In Dr. Sharma's most recent interview, appellant "came to where I was sitting and sat sideways looking away from me. There is no mental illness which causes a person to act in such a manner." Appellant moved his lips as if talking to himself, then he started to clap. He did not pick up the phone until the deputy told him to. During the interview he turned to his side and said "Shut up," and told Dr. Sharma he was talking to "Harry." He answered some of the doctor's questions about Harry's appearance, but stopped, indicating Harry told him not to tell. "At this point it became apparent to me that the claimed visual hallucinations which are not seen in schizophrenic type disorder were malingered symptoms." He noted that the jail staff did not believe appellant was mentally ill, and to the best of his knowledge, appellant did not have a history of psychiatric hospitalization. It was his opinion that appellant "is competent to stand trial and is intentionally, willfully and consciously trying to present himself as incompetent."

At the competency trial, Dr. Sachinvala testified that when she evaluated appellant he was dressed in a yellow gown, indicating he was under observation for mental illness or bizarre behavior. The jail records confirmed that "his behavior had been observed to be bizarre in the cell" and doctors there had "diagnosed him with psychosis not otherwise specified and poly substance abuse and he was treated with medication." She agreed with this diagnosis. Dr. Sachinvala disagreed with Dr. Sharma's conclusion that appellant was malingering. In her view, if appellant were malingering, he would have

6

continued with his symptoms as the court date approached; instead he agreed to a lower level of observation just 10 days before his court date. She also noted it is "difficult to fake mental symptoms consistently day after day with different people."

Dr. Sharma had reported he was unaware of any history of psychiatric problems; Dr. Sachinvala set out appellant's past psychiatric history, including a suicidal attack, depression, poor judgment and impulse control, and substance abuse. Her opinion that appellant was not competent to stand trial was not based on his mild mental retardation, but on his psychosis, which manifested in bizarre behavior. She had reviewed the recording of appellant's police interview after he was arrested, and he did not exhibit any evidence of this psychosis at that time. He did not appear to be hearing voices, he did not appear distracted, he was able to communicate appropriately with the detectives, he did not stutter or stammer. Dr. Sachinvala explained that even if appellant was not mentally ill at the time of his arrest, "it's possible that he became mentally ill later on because the onset can be at any time." She acknowledged that jail records showed periods of time when appellant was functioning well, with no indication of psychosis; she believed that may have been based on his response to medication. It was her view that appellant was not competent because he would be unable to assist counsel in his defense.

Dr. Rome also testified at the competency trial. Based on the tests administered in March 2010, appellant's overall intelligence score was 67, meaning 99 percent of the people his age scored higher than he did. He diagnosed appellant with mild mental retardation, a developmental disability. People with this disability generally require assistance in order to live independently, such as help balancing a checkbook or organizing a schedule. Other tests showed low functioning in reading and general language skills. He also noted appellant has a moderate to severe hearing impairment. It was Dr. Rome's opinion that appellant would not be able to assist counsel because "[h]e has great difficulty following normal verbal communication let alone communication that would take place in a courtroom. He has great difficulty describing events and describing occasions." Dr. Rome reviewed the recording of the police interview, and noted that appellant's answers were often "pat answers that were not fully addressing and

7

responding to what the police were asking. It seemed that as the police were asking, they were assuming that he was avoiding addressing what they were talking about rather than reflective of a language disorder which they did not really have an opportunity to know in advance that this was an individual who has been treated for that exact problem within school for years." Dr. Rome did not notice any hallucinations, delusions, or bizarre thought processes. While appellant did not show any of those symptoms during Dr. Rome's interview, "he did show a lot of the additional symptoms which occur with somebody who is perhaps psychotic or pre-psychotic." Parts of the tests Dr. Rome administered are designed to detect malingering. Appellant showed no such responses. He thought appellant might be able to better understand the courtroom processes through instructions, but he felt it would be "an almost impossible task" to instruct appellant within a reasonable period of time to be able to follow what people were saying in the courtroom and assist his counsel.

Given the differing views, Dr. Knapke was appointed to conduct a second evaluation of appellant. Before this evaluation, he had an opportunity to review the recording of the police interview and the jail psychiatric records, which were not provided to him before his first evaluation. He also was informed of Dr. Sachinvala's opinion that appellant was not competent, and Dr. Sharma's opinion that he was malingering and was competent to stand trial.

Dr. Knapke observed that "During the police interview, the defendant was not responding to any internal stimuli and was not voicing any delusions. He also was able to give a logical version of the instant offense to officers. . . . He gave a vague description of an individual he claimed was with him at the time of the incident and stated it was a homie that he called 'Smoker.' I noticed throughout the one hour video that at no point did I observe any overt signs or symptoms of a mental illness." Dr. Knapke reviewed the jail psychiatric records from July 2011, which indicated that appellant reported on more than one occasion that a voice by the name of "Harry" tells him what to do. Yet according to other entries, appellant was not observed responding to internal stimuli and was not delusional. The records indicated various diagnoses,

8

including psychosis, mood disorder, depressive disorder, major depressive disorder, opioid related disorder, and polysubstance dependence. He had been treated with Risperdal, an antipsychotic medication. Appellant's thought processes were described as linear but his thought content was paranoid.

According to Dr. Knapke, "Even though I cannot completely rule out the possibility of an underlying, low grade psychotic disorder in this defendant, I believe the defendant is currently competent to stand trial. I believe he is currently exaggerating his intellectual impairment, and I also believe he is exaggerating psychotic symptoms. He has presented himself differently to different evaluators and has been described as doing fairly well in the jail facility. He has been actively participating in his group activities with no difficulty and has been described as reading magazines and reading a book. He was able to discuss existential issues with the psychology intern at the jail facility with no difficulty. He was not observed to be responding to any internal stimuli by the mental health professionals at county jail. . . . I believe he does understand the charges and proceedings against him, and he has the capacity to rationally cooperate with his attorney if he so chooses." These conclusions were supported by a lengthy description of Dr. Knapke's interview with appellant, as well as the records from the mental health providers at the jail.

At the September 27 hearing, the trial court noted Dr. Knapke's conclusions were "wholly consistent with the observations the court has made throughout this process. I watched Mr. Dayton, of course, very carefully, as I do everyone, particularly someone who is claiming incompetency. And it seemed to me that Mr. Dayton changed his behavior depending on the circumstances, depending on whether he was or he perceived that the court was watching him as opposed to when I was looking away . . . . And he would fall into this routine that's consistent with what we're seeing now, his head going forward as though he's simply not here mentally and intellectually. But at other times, he did not behave that way. Most notably, when he would come in from lockup, he'd look around and seemed attentive. When he'd first sit down on occasion, he would seem equally attentive, and then would fall into this process of behaving as though he is not.

9

So the court is hardly persuaded . . . . I have read [the reports] carefully, have considered all of the evidence that has been presented during the course of these competency proceedings, and I've also considered the facts of the underlying offense which very, very, very strongly suggest that the defendant is competent to stand trial, at least as set forth in the preplea report. So on the influence of those factors, the court overwhelmingly concludes that the defendant is, in fact, competent to stand trial, which, again, is consistent with Dr. Knapke's most recent report."

It was appellant's burden to prove by a preponderance of the evidence, that he was incompetent. (*People v. Ary* (2011) 51 Cal.4th 510, 518; § 1369, subd. (f).) Appellant's evidence, through the reports and testimony of Dr. Sachinvala and Dr. Rome, of auditory hallucinations, limited mental ability, poor communication skills, and "bizarre behavior" was strongly countered by the court's own observations of appellant's attentive behavior in the courtroom, except when he felt he was being observed. The court's observations were consistent with the reports of Dr. Knapke and Dr. Sharma that appellant was attempting to present himself as mentally impaired and incompetent to stand trial. These conclusions were premised not just on interviews with appellant but also on the recording showing appellant's behavior during his police interview and the reports of his activities and behavior during his time in custody, including his time on the psychiatric unit. Although the evidence submitted by appellant was sufficient to cause the court to hold a hearing on his competence, it was contradicted by the reports of the other two psychiatrists and the observations of the court. Viewing the evidence in the light most favorable to the court's determination, we find substantial evidence supports the finding that appellant failed to prove, by a preponderance of the evidence, that he was not competent to stand trial.

## II

Appellant claims his counsel was ineffective because he failed to introduce available evidence and request instruction on mental and physical impairment in order to negate the required mental state for each of the charged crimes. "'"'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's

10

performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.]  Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.]"'"" (*People v. Vines* (2011) 51 Cal.4th 830, 875-876.)  A reviewing court will reverse a conviction on direct appeal for inadequate counsel only where the record on appeal affirmatively shows that counsel had no rational tactical purpose for his or her act or omission.  (*Ibid*.)

For the attempted murder charges against appellant, the People had to prove he had the specific intent to kill, and committed a direct but ineffectual act toward accomplishing the killing.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.)  The crime requires express malice; the perpetrator must either desire the victim's death, or know to a substantial certainty that the death will occur.  (*Ibid*.)  The section 664, subdivision (a) allegation requires proof that the attempted murder was willful, deliberate, and premeditated.  The evidence must support an inference that the act resulted from preexisting reflection and weighing of considerations.  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080-1081.)  The charge of shooting at an occupied motor vehicle is not a specific intent crime, but it does require proof that appellant acted willfully and maliciously.  (§ 246; *People v. Ramirez* (2009) 45 Cal.4th 980, 985.)

Evidence of appellant's mental defect or disorder was not admissible "to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.  Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 28.)

From the pretrial record in this case, we infer a strong tactical reason defense counsel chose not to pursue this avenue of defense.  As we have explained, appellant had several psychiatric examinations to evaluate his competency to stand trial.  Two of the

11

three psychiatrists who evaluated him, Dr. Sharma and Dr. Knapke, concluded he was exaggerating symptoms of mental disability in order to be found incompetent.

When these two doctors reviewed the recording of his interview with police detectives after the crimes, they did not see indications of mental disability. When Dr. Knapke interviewed appellant in May 2011, he had not seen the recording of the police interview. In preparing his second evaluation in September 2011, he was able to review the recording. Dr. Knapke observed during the police interview "that the defendant presented himself much differently compared to how he presented himself both during my May 26, 2011 examination, as well as my September 6, 2011 evaluation. I noticed that when officers were interviewing the defendant he appeared much more spontaneous in his responses to questions and his responses to questions were logical and coherent. [¶] At no point during the police interview was he demonstrating any psychotic symptoms nor voicing any delusions. He also did not appear to have decreased intellectual functioning as he presented himself during both of my interviews." Dr. Knapke noted appellant was able to discuss his employment up to the time of his arrest, his schooling, his background, and his homeless lifestyle. He told the officers he was on parole at the time of his arrest and "was able to give [them] his Department of Corrections number spontaneously. He also told officers that he realized he was facing 'an attempted murder.' [¶] During the police interview, the defendant was not responding to any internal stimuli and was not voicing any delusions. He also was able to give a logical version of the instant offense to officers. He initially appeared reluctant to discuss the instant offense but as the police interview continued, he was able to give logical responses regarding circumstances related to the instant offense. . . . I noticed throughout the one hour video that at no point did I observe any overt signs or symptoms of a mental illness."

Dr. Sharma also reviewed the recording of the police interview before preparing his report following a second evaluation. He noted that appellant had been "essentially unresponsive" when interviewed by Dr. Rome. When appellant was first interviewed by Dr. Knapke, he "was described to be as if he was intoxicated and sedated and provided

12

minimal information.  The interview of the defendant with the detectives on a videotape clearly shows that the defendant did not have any speech difficulties or problem with alertness when he was interviewed by the detectives."

These two experts, who were evaluating appellant's apparent mental health when interviewed shortly after the crimes, found no evidence suggesting that appellant was experiencing symptoms of mental impairment or disorder.  Use of such a defense could have opened the door to expert testimony regarding the apparent absence of such symptoms during the police interview, a risk reasonable counsel could choose not to take.

Appellant's own testimony at trial reaffirmed the opinions of Dr. Sharma and Dr. Knapke.  Asked about his first interview by police at the time he was caught and arrested, appellant said he made up a story when they interviewed him, telling them he ran because a car was chasing him, and he saw someone pull out something.  He gave them only partial answers because he did not know "if they're going to try to put words in my mouth or twist me up and make it seem like something it's not."  He said he gave more details about what happened during his second interview, the one with police detectives that was reviewed by Dr. Sharma and Dr. Knapke.  "Little by little, I gave -- I was starting to reveal the real story.  Partial answers.  What really happened."  Appellant explained that he gave partial answers "to try to figure out how much they did or didn't have" on him.  This testimony indicates appellant was not only aware of the circumstances of the crime, but was acting strategically by giving limited responses during police questioning.  Given this, counsel reasonably could conclude that evidence of mental impairment at the time of the crime would not have been credited by the jury.

More importantly, it was reasonable for counsel to conclude that such a defense could have undermined appellant's claim of self defense.  Appellant testified at trial that he was a Temple Street gang member.  On the day of the incident, he and another gang member were on 52nd Street near a house that was a gang hangout.  Five minutes before the incident, a car drove past them.  Appellant recognized the car and the driver, who was a rival gang member.  Appellant had previous run-ins with the driver and he was afraid the car would come back and "shoot up" the house.  He went inside the house and

13

retrieved a gun in order to protect himself and the people inside the house if the car came back.

Five minutes later, appellant was outside on 52nd Street, talking on his phone, when he looked toward the other individual and saw a panicked look on his face. Appellant peeked out from behind a car, heard some yelling and the screech of tires, then saw a red van backing up toward him. He thought the van had rival gang members in it. Appellant dropped his phone, took cover behind a car, pulled out his firearm, loaded it, and shot at the van. He was afraid he "was going to get injured or possibly killed. So I proceeded to do what I thought was right to protect myself." He thought the individuals in the van were coming toward him to threaten his life, "[m]ore than likely with a firearm." He fired his weapon because in his mind he thought he was going to get shot. He did not remember how many times he pulled the trigger. He was just trying to ward off the danger and was acting out of fear.

Appellant's testimony demonstrates that at the time of the crimes, he was thinking clearly about his circumstances, his safety and the safety of others, all of which could have supported his theory of self defense. The jury was instructed in terms of CALCRIM No. 505 (self defense), and CALCRIM No. 604 (imperfect self defense). These were viable defense theories with support in the evidence. His testimony also indicated he understood the legal ramifications of his conduct. In fact, even his limited responses to police questioning were strategic. There is no indication appellant was acting under any mental impairment or disability at the time of the offenses, or that he failed to form the necessary mental state based on mental impairment. On this record, counsel was not ineffective in failing to raise mental impairment as a defense, nor was there a basis for additional instructions on that theory.

### III

Appellant points to errors in the abstract of judgment, and respondent agrees they require correction. The abstract of judgment for the indeterminate terms on counts 2 through 6 show a 15-year enhancement pursuant to section 186.22, subdivision (b)(5) for each count. The penalty prescribed by section 186.22, subdivision (b)(5) is a 15-year

14

minimum parole eligibility period, not a 15-year enhancement.  (See *People v. Campos* (2011) 196 Cal.App.4th 438, 448-449.)  The abstract of judgment for the indeterminate terms should be amended to properly reflect the 15-year minimum parole eligibility periods rather then 15-year enhancements

A similar error is reflected on count 1.  The court sentenced appellant to the middle term of five years, plus a consecutive life term with a 15-year minimum parole eligibility pursuant to section 186.22, subdivision (b)(4), plus a consecutive sentence of 25 years to under section 12022.53, subdivision (d).  (Sentence on count 1 was stayed pursuant to section 654.)  The abstract of judgment erroneously lists the section 186.22, subdivision (b)(4) term as an enhancement, instead of a 15-year minimum parole eligibility period.  In addition, the court listed this sentence on the determinate term abstract of judgment, instead of on the indeterminate sentence abstract of judgment.  The abstracts of judgment should be amended to correct these errors.

## DISPOSITION

The court is directed to modify the abstracts of judgment in accordance with the views expressed in this opinion and to forward the modified abstracts to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**




EPSTEIN, P. J.

We concur:




WILLHITE, J.                                    COLLINS, J.


15